UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIEKERT DE MEXICO S.A. de CV,

     Plaintiff,

v.                                                              Case No. 24-cv-11734

BROSE JEFFERSON, INC.,                     Honorable Robert J. White

     Defendant.

---

**ORDER GRANTING PLAINTIFF'S RULE 12(c) MOTION FOR
PARTIAL JUDGMENT ON THE PLEADINGS**

---

Kiekert de Mexico S.A. de CV (Kiekert) commenced this action against Brose Jefferson, Inc. (Brose) after Brose allegedly strayed from the terms of the parties' contract by improperly deducting thousands of dollars from payments it owed Kiekert. (ECF No. 13, PageID.76).  Kiekert brought a claim for breach of contract and a request for declaratory judgment based on the deductions. (*Id.* at PageID.79–81).  In addition, in Count 3 of its amended complaint, Kiekert asked the Court to declare that Kiekert's contract with Brose is unenforceable under the statute of frauds and creates only a release-by-release agreement such that Kiekert may reject Brose's future orders at its discretion. (*Id.* at PageID.82).

Presently before the Court is Kiekert's motion for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c) on Count 3. (ECF No. 21).

The Court held a hearing on the motion on June 3, 2025. (ECF No. 33).  For the reasons stated below, the Court will grant Kiekert's motion.

## I.    Background

Kiekert is a Mexican company that manufactures and supplies door latches, locks, and other component parts for vehicles. (ECF No. 13, PageID.74).  Brose is a Michigan company that contracted with Kiekert to buy side door locks, which Brose incorporated into door assemblies that it sold to non-party FCA US, LLC (FCA). (*Id.*; ECF No. 14, PageID.101, 103).  On January 6, 2020, Brose memorialized its agreement with Kiekert by issuing Framework Purchase Agreement No. 06000000000360806 (the "FPA") for the side door locks. (ECF No. 14, PageID.104).  The FPA set forth the part number and applicable price for each lock model and established payment and delivery terms. (ECF No. 13-1, PageID.86–91; ECF No. 14, PageID.104).  The FPA also expressly incorporated Brose's 2006 Global Terms and Conditions of Purchase (GTCP). (ECF No. 13-1, PageID.86) ("The Brose Global Terms and Conditions of Purchase including the respectively applicable Addendum issued May 2006 . . . form an integral part of this contract."). Together, the FPA and GTCP formed the parties' contract. (*Id.*).

The parties' contract functioned as follows:  Brose would issue "delivery schedules (Release)" under the FPA, (ECF No. 13-1, PageID.86); Kiekert would supply the side door locks to Brose based on Brose's "requirements," (ECF No. 14,

PageID.105); and Brose would pay Kiekert for the locks delivered. (*Id.*).  In June 2023, however, Kiekert switched from a Tennessee sub-supplier to a Korean sub-supplier to obtain certain sub-components for its side door locks. (ECF No. 14, PageID.107; ECF No. 13, PageID.76).  As a result, the side door locks lost United States-Mexico-Canada Agreement (USMCA) eligibility and became subject to a 5.7% USMCA fee. (ECF No. 14, PageID.107).

Kiekert claimed that Brose began to improperly debit Kiekert for the added cost to Brose of the USMCA fees, (ECF No. 13, PageID.78); Brose denied the allegations. (ECF No. 14, PageID.108).  According to Kiekert, it is losing a significant amount of money on a weekly basis due to Brose's improper debits and the resulting cash flow drain is unsustainable. (ECF No. 13, PageID.82).  Kiekert brought this action against Brose to prevent further losses and recover what it is entitled to under the contract. (*Id.* at PageID.79–83).

In the present motion, Kiekert asked the Court to enter judgment on Count 3 and declare that the FPA is unenforceable and that Kiekert is allowed to reject releases at its discretion. (ECF No. 21, PageID.213).  Brose refuted Kiekert's characterization of the FPA and asked the Court to deny the motion. (ECF No. 27, PageID.251–52).  At the heart of the parties' dispute is whether or not the FPA contains a sufficient quantity term, such that it satisfies the statute of frauds and is thereby enforceable under Michigan law.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  In reviewing a motion for judgment on the pleadings, courts "construe the complaint in the light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the complaint contains enough facts to make the legal claims facially plausible." *Anders v. Cuevas*, 984 F.3d 1166, 1174 (6th Cir. 2021).

Accordingly, when a plaintiff moves for judgment on the pleadings, courts consider "whether the plaintiff's petition, stripped of those allegations which are denied by defendant's answer, would leave the petition stating a cause of action against the defendant." *United Food & Com. Workers, Local 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022) (quoting 61A Am. Jur. 2d *Pleading* § 497); *see also Lowden v. Cnty. of Clare*, 709 F. Supp. 2d 540, 546 (E.D. Mich. 2010).  Once the court accepts the "answer's well-pleaded allegations as true and construe[s] the pleadings and exhibits in a light most favorable to the defendant, the motion may be granted only if the plaintiff is nevertheless clearly entitled to judgment." *United Food*, 51 F.4th at 202 (citation omitted) (cleaned up).

Courts may also consider exhibits attached to a motion for judgment on the pleadings "'so long as they are referred to in the Complaint and are central to the

claims contained therein.'" *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d

656, 695 (6th Cir. 2018) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d

426, 430 (6th Cir. 2008)); *see also Lowden*, 709 F. Supp. 2d at 546.

## III.    Analysis

Kiekert moved for judgment on the pleadings on its request for declaratory

judgment under Count 3. (ECF No. 21, PageID.213).  It specifically asked the Court

to declare that the FPA is a release-by-release agreement that allows Kiekert to reject

releases at its discretion. (*Id.* at PageID.230).  But according to Brose, Kiekert lacked

standing to bring its request for declaratory judgment. (ECF No. 27, PageID.258).

And even if Kiekert did have standing, its motion fails on the merits because the FPA

is properly construed as a requirements contract, not a release-by-release agreement,

such that it is enforceable under the statute of frauds. (*Id.* at PageID.263–70).  Brose

also asserted that Kiekert's motion is premature and that the Court should afford

Brose an opportunity to explore its defenses through discovery before ruling on

Count 3. (*Id.* at PageID.270).

The Court finds that Kiekert has standing to bring its request.  And ultimately,

there is no genuine issue of material fact as to whether the FPA constitutes a release-

by-release agreement or a requirements contract.  Rather, the FPA speaks for itself,

and its quantity term is insufficient to satisfy the statute of frauds.  The Court will

therefore grant Kiekert's request and declare that Kiekert is able to reject releases at

its discretion.  In doing so, the Court rejects Brose's argument that the motion is premature.

### A.      Kiekert Has Standing to Request Declaratory Judgment on Count 3.

As a threshold matter, the Court will address Brose's argument that Kiekert's declaratory relief claim is non-justiciable.  Under the Declaratory Judgment Act (the Act), a court may "declare the rights and other legal relations of any interested party seeking such declaration" upon the "filing of an appropriate pleading." 28 U.S.C. § 2201(a).  The statute requires that an "actual controversy" exist to grant such relief. *Id.*  It does not, however, prevent courts from issuing declaratory judgment if other forms of relief are available. *Id.* (stating a court may declare the rights of parties "whether or not further relief is or could be sought"); *see also* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").  Generally, the Act "'confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'" *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).

To succeed on a request for declaratory judgment, the movant must "plausibly allege facts that, 'under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment.'" *Saginaw Cnty., Mich. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020) (quoting *Medimmune*, 549 U.S. at 127).  And because the Act "does not change the essential requisites for the exercise of judicial power," a court must still have jurisdiction under Article III to decide the issues. *Saginaw*, 549 U.S. at 954 (citation omitted). Inherent to the Article III jurisdiction analysis, then, and at issue here, is whether Kiekert has standing to bring its request for declaratory relief.

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2.  To satisfy the "case-or-controversy requirement," otherwise referred to as "standing," a plaintiff must allege an "injury in fact – a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citation omitted).  And not only is this required under the Constitution, but it is reinforced by the need for an "actual controversy" under § 2201(a).  *See Saginaw*, 549 U.S. at 954 (referencing "Supreme Court's long equation of the Act's 'actual controversy' requirement with Article III's case-or-controversy imperative"); *see also Fieger v. Mich. Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009).

According to Brose, there is no "actual controversy" as required under both Article III and the Act, and Kiekert therefore lacks standing to request declaratory

judgment. (ECF No. 27, PageID.251–52, 258–59).  That is, because Kiekert has yet to reject any releases, it faces no actual or certainly impending harm. (*Id.* at PageID.260).  Instead, the harm – namely, that Brose might sue Kiekert for breach and Kiekert could thereby face liability – is speculative only. (*Id.* at PageID.259–61).  And such harm ultimately depends on the following chain of contingencies: (1) Brose needs automotive parts in the future; (2) Brose issues a release to Kiekert for those parts; (3) Kiekert rejects the release; and (4) Brose sues Kiekert. (*Id.* at PageID.259–60).  Under Kiekert's argument, then, the connection between the act (rejection) and the harm (a lawsuit) is too attenuated to establish standing. (*Id.* at PageID.260–61).  Brose thus asked the Court to deny Kiekert's motion. (*Id.* at PageID.263).

Kiekert argued that it already suffered harm considering Brose is underpaying Kiekert for releases in violation of the parties' agreement. (ECF No. 21, PageID.222).  In addition, Kiekert argued that it need not expose itself to liability before bringing suit to challenge the basis of the liability. (ECF No. 28, PageID.286–87).  Therefore, an actual, justiciable controversy exists given that the only way to resolve the parties' dispute short of Kiekert's breach is for the Court to declare the rights of the parties. (*Id.*).

The Court finds that Kiekert has standing to request declaratory relief.  To begin, Kiekert need not expose itself to liability to meet the "actual controversy"

requirement.  The Court tracks the reasoning in the Supreme Court's holding in *Medimmune* to reach its decision.  In that case, the Supreme Court considered whether a patent licensee needed to terminate or breach its license agreement before it could seek declaratory judgment that the underlying patent was invalid, unenforceable, or not infringed. *Medimmune*, 549 U.S. at 120–21.  At the time of suit, the licensee continued to make royalty payments, albeit under protest and with reservation of all rights, as opposed to facing a lawsuit for patent infringement. *Id.* at 122.  The analysis therefore factored in whether the licensee's decision to continue making payments eliminated the imminent threat of harm necessary for a justiciable case or controversy. *Id.* at 128.

The Supreme Court relied on its previous decision in *Altvater v. Freeman*, 319 U.S. 359 (1943) to declare that the licensee had standing. *Medimmune*, 549 at 130–32.  Under *Altvater*, the case-or-controversy requirement is satisfied when payment is demanded as of right and made, but the "involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." 319 U.S. at 365.  As applied in *Medimmune*, the licensee's uncontradicted allegation that respondents would enjoin sales if the licensee did not pay royalties rose to the level of "involuntary or coercive." 549 U.S. at 128, 131 n.10, 132.  Put another way, "[t]he rule that a plaintiff must destroy a large building, bet the farm, or (as here) risk treble damages and the loss of 80 percent of its business before

seeking a declaration of its actively contested legal rights finds no support in Article III." *Id.* at 134.

Like the patent licensee in *Medimmune*, Kiekert accepts Brose's releases, and deductions, under protest and with all rights reserved. (ECF No. 13-2, PageID.93–94). At present, Kiekert must either continue to accept releases with the deductions or reject them and face liability. Considering Kiekert suffers harm under both options, the argument that no actual controversy exists is unpersuasive. This is especially true given that Kiekert's injury is ongoing simply by maintaining the status quo.

Plus, if Kiekert rejected a release without a ruling from this Court, it is highly likely that the parties would be back before the Court on the same issue, but on Brose's motion instead. And in that scenario, Kiekert risks damages above and beyond the value of the releases under the contract. As in *Medimmune*, the Court does not find that Kiekert needs to expose itself to liability in order to resolve its actively contested legal rights. *Id.* at 131–34. To add, that the present controversy revolves around a contract between private parties does not change the analysis or the standing determination. *See Medimmune*, 549 U.S. at 134, n.12 ("Article III does not favor litigants challenging threatened *government* enforcement action over litigants challenging threatened *private* enforcement action.").

10

Brose countered that Kiekert's standing to bring its breach of contract claim does not establish standing for its declaratory judgment request in Count 3. (ECF No. 27, PageID.259).  That is, Kiekert cannot rely on the injury caused by Brose's alleged breach of contract to bootstrap its declaratory relief request when that request is based on a hypothetical rejection and Brose, not Kiekert, would be injured by Kiekert's breach. (*Id.* at 260–61).  To the extent that standing for one claim does not create standing for all claims, Brose is correct. *Carmen v. Yellen*, 112 F.4th 386, 399 (6th Cir. 2024) ("Standing is assessed on a claim-by-claim basis and 'is not dispensed in gross.'") (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  Thus, Brose's alleged breach of the parties' contract, and the injury Kiekert suffered from the improper deductions, does not on its own establish standing for Count 3.

But Kiekert's standing derives not just from Brose's breach and the harm of further deductions, but also from the fact that Kiekert's only alternative is to breach the contract itself and potentially face liability.  Because the Supreme Court held that such a scenario is sufficient to establish standing, *see Medimmune*, 549 U.S. at 131–34, the Court is not convinced that Kiekert improperly bootstrapped Count 3 to its breach of contract claim.  Likewise, and contrary to Brose's argument, Kiekert's standing here does not depend on a chain of contingencies.  The case Brose relied on to support its chain of contingencies argument, *Hemlock Semiconductor Corp. v.*

*Kyocera Corp.*, 747 Fed. App'x 285 (6th Cir. 2018), is distinguishable. (ECF No. 27, PageID.259).   In *Hemlock*, the party seeking declaratory judgment failed to demonstrate an actual controversy because the "chain of contingencies necessary to trigger" the acceleration provision at issue was "hardly immediate." 747 F. App'x at 292 (citation omitted) (cleaned up).   To trigger the acceleration provision, "[respondent] would need to default, [appellant] would need to service notice of default, 180 days would have to pass in which [respondent] could cure, and at the close of that period, [appellant] would need to elect to terminate the contract." *Id.* at 291.   Here, the question simply consists of whether Kiekert will accept or reject future releases.   It is akin, then, to the situation in *Medimmune*, where "all that remained was for a party to refuse to pay royalties." *Id.* at 292 (distinguishing *Medimmune*).   The Court therefore finds Brose's reliance on *Hemlock* unpersuasive. And ultimately, Brose failed to demonstrate that Kiekert lacked standing.

### B.   The FPA is a Release-by-Release Agreement Unenforceable under the Statute of Frauds.

The parties disputed whether their contract qualifies as a release-by-release agreement such that Kiekert may reject Brose's releases at its discretion. (ECF No. 21, PageID.224–29; ECF No. 27, PageID.263–70).   Kiekert alleged that because the FPA and the GTCP do not contain sufficient quantity terms, the FPA does not satisfy the statute of frauds. (ECF No. 13, PageID.82; ECF No. 21, PageID.224).   As a result, the FPA is a release-by-release agreement under Michigan law that allows

Kiekert to reject all future releases. (ECF No. 13, PageID.82; ECF No. 21, PageID.224).  Brose refuted the characterization of the FPA as a release-by-release agreement, and instead claimed that the FPA is a requirements contract. (ECF No. 27, PageID.263).   Brose argued the "quintessential requirements language" contained in the FPA supports its argument. (*Id.* at PageID.252).

"The Uniform Commercial Code's statute of frauds, which Michigan has adopted, requires certain contracts to be in writing."   *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 405 (6th Cir. 2024).[1]  Specifically, "a contract for the sale of goods for the price of $1,000.00 or more is not enforceable . . . unless there is a writing sufficient to indicate that a contract for sale has been made between the parties". Mich. Comp. Laws § 440.2201(1).  And critically, such a contract is unenforceable under § 440.2201(1) "beyond the quantity of goods shown in the writing." *Id.*  Thus, quantity "is the only *essential* term required by the statute of frauds." *MSSC, Inc. v. AirBoss Flexible Prods. Co.*, 511 Mich. 176, 181 (2023).  Without a quantity term, the contract is unenforceable. *See Higuchi*, 103 F.4th at

---

[1] Michigan law applies to the parties' dispute. "Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the states in which they sit . . . Michigan law generally allows parties to choose what state's law will govern their contract." *R&D Distributing Corp. v. Health-Mor Indus., Inc.*, 118 F. Supp. 2d 806, 808 (E.D. Mich. 2000).  Per the GTCP, the FPA "shall be governed by the laws of the country (or state) where Buyer's principal place of business is located." (ECF No. 14-2, PageID.136).  Here, Brose is the buyer.  Because Brose's principal place of business is located in Michigan, Michigan law applies. (ECF No. 14, PageID.101).

406.  In determining whether a contract contains a quantity term, a court may only look to the four corners of the contract. *AirBoss*, 511 Mich. at 181 ("[P]arol evidence – that is, evidence outside the contract itself – cannot be offered to supply a missing quantity term.") (citation omitted) (cleaned up).

The quantity term used also affects how a court interprets a contract and its enforceability.  The Uniform Commercial Code (UCC) recognizes that quantity can be measured by (1) the number of goods to be sold, (2) the output of the seller, or (3) the requirements of the buyer. *Higuchi*, 103 F.4th at 406; *see* Mich. Comp. Laws § 440.2306(1) (adopting the UCC).  Interpretation of (3), "the requirements of the buyer," defines the dispute at issue here.  That is, the parties disagree about whether the FPA's terms fall within the third category and thereby form a "requirements contract."  If the FPA qualifies as a requirements contract sufficient to satisfy the statute of frauds, it is enforceable.

As the name suggests, a requirements contract "defines quantity by reference to the buyer's requirements." *AirBoss*, 511 Mich. at 182.  To satisfy the statute of frauds, a requirements contract must "dictate that the buyer will obtain a set share of its total need from the seller (such as all requirements of the buyer)." *Higuchi*, 103 F.4th at 406 (citation omitted) (cleaned up).  "[A] central purpose of a requirements contract is to obligate the buyer to source its requirements from the seller." *Id.* at 407.  So long as a requirements contract indicates that it will obtain a set share, it

14

"may leave the final or total quantity ambiguous or unspecified." *AirBoss*, 511 Mich. at 193.  A requirements contract cannot, however, state an "imprecise quantity term." *Id.*  For example, language that a buyer would accept "some portion or all of its requirements" is too imprecise to create an enforceable requirements contract. *Ultra Mfg. (U.S.A.) Inc. v. ER Wagner Mfg. Co.*, 713 F. Supp. 3d 394, 398 (E.D. Mich. 2024).

As implied, a contract that refers to a buyer's requirements without binding the buyer to obtain a set share of those requirements does not establish a requirements contract. *L&P Auto. Luxembourgh S.a.r.l. v. Neways Elecs. Riesa GmbH & Co. KG*, No. 24-12202, 2024 WL 4424788, at *4 (E.D. Mich. Oct. 4, 2024). Instead, such an agreement "permits the parties to form contractual obligations on a release-by-release basis." *Higuchi*, 103 F.4th at 406.  The Michigan Supreme Court recently distinguished a release-by-release agreement from a requirements contract in its *AirBoss* decision.  It explained that both are commonly created by a blanket purchase order that sets forth various terms such as price and the length of the contract. *AirBoss*, 511 Mich. at 183.  A buyer will "typically later issue 'releases'" to supplement the blanket purchase order and inform the seller of its "specific short-term requirements." *Id.*  But whereas a requirements contract will include the set share of a buyer's total need in the blanket purchase order, a release-by-release agreement does not. *Id.* at 184.  Rather, with a release-by-release agreement, "the

purchase order is more appropriately thought of as an umbrella agreement that governs the terms of future contract offers." *Id.* And "[a]lthough the seller is not bound to accept future orders in the same manner as with a requirements contract, the seller is bound by the terms agreed to in the purchase order when future releases are issued and accepted." *Id.*

Unlike a requirements contract, a release-by-release agreement "gives both parties the freedom to allow their contractual obligations to expire in short order by either not issuing or not accepting a new release." *Id.* at 185 (citation omitted). As a result, it establishes no "long-term obligations" for the parties to buy or sell parts from one another. *Higuchi*, 103 F.4th at 406. And, critically, a release-by-release agreements is not, on its own, an enforceable contract. *Airboss*, 511 Mich. at 190. Because release-by-release agreements do not contain precise quantity terms, they do not satisfy the statute of frauds. *Id.* Thus, the parties may issue, accept, or reject releases at their discretion without risk of breach. *See id.* at 185 ("The seller cannot be guaranteed future business from the buyer, but the seller can accept or reject any offer for future orders.").

The following examples illustrate when a contract is considered a release-by-release agreement as opposed to a requirements contract. To begin, in *AirBoss*, the parties consisted of automotive suppliers who contracted with each other to assemble parts for automobile companies. *Id.* at 185–86. Specifically, the plaintiff issued a

purchase order to the defendant for parts that the plaintiff would use to build suspension systems for vehicles. *Id.* at 186.  The purchase order "included specific terms and incorporated the general terms and conditions found on [plaintiff's] website." *Id.*  Although the terms and conditions obligated plaintiff to send releases for "specific part revisions, quantities and delivery dates" under its purchase order, it did not obligate plaintiff "to send any number of firm orders to [defendant] – either as a raw number or as a percentage of [plaintiff's] total need." *Id.* at 187.  Because the purchase order "made no reference anywhere to a quantity term," the releases issued in accordance with the purchase order "only constituted an obligation binding [defendant] as to each individual release if [defendant] accepted – not a promise to fulfill all future releases." *Id.* at 190.  The fact that the releases contained a firm quantity term and estimated the plaintiff's future need did not change the analysis. *Id.*  Overall, the terms and conditions and the purchase order set "blanket policies governing the sale of parts" but established no obligations for the parties. *Id.* Accordingly, "[e]ither party was able to walk away from the agreement once a release was fulfilled." *Id.* at 198–99.

*Higuchi* involved a similar set of facts.  Plaintiffs were automotive parts suppliers that sold seatbelt parts to defendant, which in turn manufactured seatbelt safety systems for car companies. *Higuchi*, 103 F.4th at 403.  Defendant purchased parts from plaintiffs through purchase orders and releases. *Id.*  The purchase orders

contained general information about price and tariff numbers; after it sent a purchase order, defendant would later issue releases containing the "specific quantities" of plaintiffs' parts it wanted to purchase. *Id.*   The purchase orders all included a statement that "[t]his blanket contract is issued to cover [defendant's] requirements of the parts listed below." *Id.*   They also stated that defendant was under no obligation to purchase parts absent the issuance of a release. *Id.*   The Sixth Circuit held that the writing did not create a requirements contract, but rather a release-by-release agreement, because the purchase orders did not "unambiguously obligate [defendant] to purchase its requirements from [plaintiffs], let alone precisely state the specific share of requirements at issue." *Id.* at 406–07.   The court refused to infer that the phrase "[defendant's] requirements" meant that defendant had to buy "*any and all* requirements from [plaintiffs]." *Id.* at 407.

Here, Kiekert asked the Court to interpret the contract as lacking a sufficient quantity term. (ECF No. 21, PageID.221).   Brose countered that the FPA contains a quantity term such that the contract is enforceable under the statute of frauds. (ECF No. 27, PageID.266).   For context, the FPA states that Brose is  "authorized to issue delivery schedules (Release) under the conditions of the Framework Purchase Agreement in accordance with its needs . . . Only delivery schedules cause an obligation for Brose to accept deliveries." (ECF No. 13-1, PageID.86).   The GTCP further provides:

> [A] Purchase Order does not constitute an acceptance by Buyer of any offer to sell, any quotation, or any proposal made by Supplier . . . Quantities and dates of delivery are specified solely in the Purchase Order or in delivery schedules issued by Buyer . . . Buyer's purchase obligation is limited to four (4) weeks of production of finished Goods and an additional eight (8) weeks of raw material inventory based consecutively on quantities under delivery schedules. Quantities exceeding these periods are forecasts and do not obligate Buyer to purchase such quantities.

(ECF No. 14-2, PageID.127).

The Court finds that neither the FPA nor the GTCP specify quantity in a precise enough manner to satisfy the statute of frauds.  Instead, the FPA authorizes Brose to issue Releases "in accordance with its needs."  Although Brose asked the Court to infer that "its needs" meant its requirements, (ECF No. 27, PageID.265–66), the Sixth Circuit in *Higuchi* rejected the term "requirements" as insufficient under the statute of frauds. 103 F.4th at 406–07.  That is, because the term "requirements" did not obligate the buyer to purchase "a specific percentage, 'all' of its requirements, or any equivalent language" from the buyer, it did not satisfy the statute of frauds. *Id.* at 407.  The same logic is applicable to Brose's use of the term "needs."

Plus, the GTCP seemingly gives Brose discretion to issue releases at whatever quantity it specifies.  Only Brose can set the quantity of parts it needs in its releases and is not required to purchase anything beyond what is provided for in its delivery

schedules. (ECF No. 14-2, PageID.127).  Overall, the lack of obligation on Brose's part indicates that the contract is a release-by-release agreement.

Without a precise quantity term, the Court finds that the parties' agreement does not satisfy the statute of frauds and is therefore not a requirements contract. The FPA and GTCP, when viewed wholistically, support the Court's finding.  As a result, the Court will grant Kiekert's request for declaratory judgment and declare that the FPA is a release-by-release agreement under which Kiekert has discretion to reject releases.

Finally, the Court finds Brose's appeal to recent supplemental authority unpersuasive.  Brose argued that the facts here are analogous to those in *FCA US LLC v. Kamax Inc.*, --- N.W.3d ----, No. 371234, 2025 WL 1420392 (Mich. Ct. App., May 14, 2025). (ECF No. 34, PageID.305).   But in *Kamax*, the purchase order indicated that it was for "approximately 65%-100%" of the buyer's requirements. *Id.* at *1.  The court emphasized the importance of the contract's range to its analysis. That is, while the 65%-100% range was "nonspecific," it still was a quantity term that could be "evaluated further using parol evidence." *Id.* at *4.  Here, the quantity term is Brose's "needs," with no guidance as to what "needs" means.  Unlike *Kamax*, there is no range to inform the Court's interpretation.  Because the facts more closely

resemble those in *Airboss* and *Higuchi*, the decision in *Kamax* does not change the Court's reasoning or outcome.

### C.     Kiekert's motion is not premature.

Finally, the Court rejects Brose's contention that Kiekert's motion is premature. (ECF No. 27, PageID.271).  Brose claimed that additional discovery into the parties' relationship with FCA, the non-party that incorporates the completed parts into its cars, would reveal whether additional documents govern the parties' supply contract.  (*Id.*).  But it is unclear what affect this would have considering (1) parol evidence is not allowed to create a quantity term and (2) the four corners of the contract speak for themselves.  Considering the dispute presently revolves around whether the FPA contains a sufficiently precise quantity term, the Court is not persuaded that discovery into non-party FCA's instructions regarding quantity would cause the court to change its decision.

* * *

For the reasons given, the Court **ORDERS** that the motion for partial judgment on the pleadings (ECF No. 21) is **GRANTED**.

Dated: June 12, 2025                                   s/Robert J. White _____
                                                                   Robert J. White
                                                                   United States District Judge